Scott A. Kamber, Esq. (pro hac vice)
*skamber@kamberedelson.com*
KAMBEREDELSON, LLC
11 Broadway, 22nd Floor
New York, New York  10004
Telephone: (212) 920-3072
Facsimile: (212) 202-6364

David C. Parisi, Esq. (SBN 162248)
*dcparisi@parisihavens.com*
Suzanne Havens Beckman (SBN 188814)
*shavens@parisihavens.com*
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California  91403
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

ATTORNEYS FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In Re TD AMERITRADE ACCOUNTHOLDER LITIGATION | Master File No. C 07-2852 VRW<br><br>[Assigned to the Hon. Vaughn R. Walker]<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT**<br><br>**Date:          September 10, 2009**<br>**Time:          10:00 a.m.**<br>**Location:   Courtroom 6, 17th Floor**<br>**                    450 Golden Gate Ave.**<br>**                    San Francisco, CA  94102** |

Plaintiffs' Motion for Final Approval
of Class Action Settlement

Case No. C 07-2852 VRW

# NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that Plaintiffs will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of a proposed settlement in this consumer class action on September 10, 2009, at 10:00 a.m., or as soon thereafter as counsel may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California  94102, in Courtroom 6, before the Honorable Vaughn R. Walker.

Plaintiffs seek final approval of this class action settlement as fair, reasonable and adequate.  Plaintiffs also seek approval of Class Counsel's request for reasonable attorney's fees and Plaintiffs' incentive awards for serving as class representatives in this matter.  The Motion is based on this Notice of Motion, the accompanying Brief in Support of the Motion and the authorities cited therein, the declarations of counsel, oral argument of counsel, and any other matter that may be submitted at the hearing.

Dated: August 20, 2009

SCOTT KAMBER
KAMBEREDELSON, LLC

By:_____s/Scott A. Kamber_____
Attorneys for Plaintiffs
Brad Zigler and Joel Griffiths

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

    A.  The Litigation Caused Defendant's Disclosure ...................................... 1

    B.  Discovery Demonstrated That Identity Theft Was Highly Unlikely ...................... 1

    C.  The Settlement Makes Defendant's Customer Data Safer ......................................... 2

    D.  The Software Provided Is Appropriate Relief For Spam ........................................ 2

    E.  The Reaction of the Market Further Shows that the Settlement Is Fair, Reasonable And Adequate ......................................................... 2

II.  THE NOTICE DIRECTED TO THE CLASS COMPORTS WITH DUE PROCESS AND RULE 23 ........................................................................... 3

III.  THE SETTLEMENT WARRANTS FINAL APPROVAL ................................................. 4

    A.  The Strength of the Plaintiffs' Case ....................................................... 5

    B.  The Risk of Continued Litigation.............................................................. 6

    C.  The Risk of Maintaining Class Action Status ......................................... 6

    D.  The Amount Offered in the Settlement .................................................... 7

    E.  The Extent of Discovery Completed.......................................................... 8

    F.  The Experience and Opinion of Counsel ................................................ 8

    G.  The Presence of a Governmental Participant ......................................... 9

    H.  The Procedure by which the Settlement was Arrived At ......................... 9

    I.  The Role Taken by the Plaintiffs in the Process .................................... 10

    J.  The Reaction of Class Members .............................................................. 10

        **(1)**  Requests to Opt Out ................................................................... 11

        **(2)**  Objections....................................................................................... 11

IV.  THE ATTORNEYS' FEES AND EXPENSES ARE REASONABLE.............................. 22

    A.  Class Counsel's Base Lodestar is Reasonable and Appropriate ............. 22

    B.  Class Counsel's Requested Multiplier Falls Within the Range Typically Approved by This Court and Is Reasonable Given the Facts of the Litigation ............................................................................................... 23

    C.  Plaintiffs' Request for Reimbursement of their Extended Costs is Reasonable .............................................................................................. 25

1

V.      THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE
        AWARDS TO THE CLASS REPRESENTATIVES ......................................................... 25

VI.     CONCLUSION .............................................................................................................. 26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## Table of Authorities

2

Cases

3
4
"); In re Janney Montgomery Scott LLC Financial Consultant Litigation, 2009 WL 2137224 (E.D. Pa.)................................................................................................................................ 21

5
Behrens v. Wometco Enterprises, Inc., 118 F.R.D. 534 (S.D.Fla.1988) ........................................ 24

6
Boyd v. Cechtle Corp., 485 F. Supp. 610 (N.D. Cal. 1979)............................................................ 11

7
Bracher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722 (10th Cir. 1993) ................................ 25

8
Burgess v. Eforce Media, Inc., No. 1:07CV231, 2007 WL 3355369 (W.D.N.C. Nov. 9, 2007) ..... 18

9
Cherny v. Emigrant Bank, 604 F.Supp.2d 605 (S.D.N.Y. 2009) .................................................... 17

10
Churchill Village v. General Electric, 361 F. 3d 566 (9th Cir. 2004)............................................. 11

11
City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974) ...................................................... 12

12
Devlin v. Scardelletti, 536, U.S. 1 (2002) ...................................................................................... 21

13
Duhaime v. John Hancock Mut. Life Ins. Co. 177 F.R.D. 54 (D. Mass. 1997) ................................. 7

14
Ellis v. Naval Air Rework Facility, 87 F.R.D. 15 (N.D. Cal. 1980) ................................................ 11

15
Friend v. Kolodzieczak, 72 F.3d 1386 (9th Cir. 1995).................................................................... 22

16
GMC Pick-Up Truck, 55 F.3d 768 (1995) ...................................................................................... 20

17
Graham v. DaimlerChrysler Corp., 34 Cal.4th 553 (2004) ............................................................ 24

18
Hanson v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998) ............................................................... 4

19
Harris v. Marhoefer, 24 F.3d 16 (9th Cir. 1994)............................................................................ 25

20
Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)............................................................................ 22

21
In re Avista Corp. Sec. Litig., 2007 WL 4568933 (E.D. Wash.)...................................................... 21

22
In re Cendant Corp. Litig., 264 F.3d 201 (3d. Cir. 2001)............................................................... 21

23
24
In re Cuisinart Food Processor Antitrust Litig. M.D.L. 447, 1983 WL 153 (D. Conn. Oct. 24, 1983)............................................................................................................................................ 7

25
In re Domestic Air Transp. Antitrust Litig. 148 F.R.D. 297 (N.D. Ga. 1993) .................................. 7

26
In re HPL Technologies, Inc. Sec. Litig., 366 F.Supp.2d 912 (N.D. Cal. 2005).............................. 22

27
In re Media Vision Tech. Sec. Litig., 913 F.Supp. 1362 (N.D. Cal. 1996)....................................... 25

28
In re OmniVision Tech. Inc., 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .......................................... 4, 8

*In re Pacific Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995) ........................................ 8

*In re Prudential Ins. Co. of Am. Sales Practices Litig.* 962 F. Supp. 450 (D. N.J. 1997) ............... 7

*In re Wells Fargo Securities Litigation*, 991 F.Supp. 1193 (N.D. Cal. 1998)................................. 17

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) ........................................ 23

*Ketchum v. Moses*, 24 Cal. 4th 1122, 1138 (2001) ........................................ 24

*Key v. DSW, Inc.,* 454 F.Supp.2d 684, 690 (S.D.Ohio 2006) ........................................ 18

*Knigh v. Red Door Salons, Inc.t*, No. 08-01520 SC, 2009 WL 248367, ........................................ 26

*Lealao v. Beneficial Ca., Inc.*, 82 Cal.App.4th. 19 (2000); ........................................ 22

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005)........................................ 6

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003); ........................................ 4

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........................................ 3

*Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)...................... 10

*Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629 (7th Cir. 2007) ........................................ 17

*Press v. Lucky Stores, Inc.*, 34 Cal.3d 311 (1983) ........................................ 22

*Ruiz v. Gap*, 540 F.Supp. 2d 1121 (N.D.Cal., 2008) ........................................ 17

See *In re Integra Realty Resources, Inc.,* 354 F.3d 1246........................................ 21

See *In Re Mego Fin. Corp. Sec. Litig.*, 213 F. 3d 454 (9th Cir. 2000) ........................................ 26

*Serrano v. Priest,* 20 Cal.3d 25 (1977)........................................ 24

*Shafran v. Harley-Davidson, Inc.,* No. 07 Civ. 01365, 2008 WL 763177 (S.D.N.Y. Mar. 20, 2008)
........................................................................................ 18

*Shaw v. Toshiba Am. Infos. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000)........................................ 7

*Stollenwerk v. Tri-West Health Care Alliance*, 254 Fed.Appx.664 (9th Cir. 2007). ........................ 15

*v. Mercedes-Benz USA, LLC.* 214 F.R.D. 266 (E.D. Pa. 2003) ........................................ 7

*Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976) ........................................ 4

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2002)........................................ 22

*Vranken v. Atlantic Richfied Co.,* 901 F.Supp.294, 297 (N.D. Cal., 1995) ........................................ 24

*Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224 (2001) ........................................ 24

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) ........................................ 4

*Wilson v. Airborne, Inc.*, 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008)........................................ 11

*Wing v. Asarco Inc.*, 114 F.3d 986, 988 (9th Cir. 1997).................................................. 22

Young v. Polo Retail, LLC, 2007 WL 951821, (N.D. Cal. 2007) ................................................. 2, 5

<u>Other Authorities</u>

Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:41 (4th Ed. 2009) .............. 4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Prior to the commencement of this litigation, a TD Ameritrade database containing a wide range of customer information was penetrated by an apparent hacker. At the time this litigation was filed in May 2007, Ameritrade had not publicly admitted that any customer information had been compromised nor had they taken any additional protective measures in response to defend customer information. The complaint filed in this action sought disclosure of the breach, remediation for the Class, and further injunctive relief to make such a breach less likely going forward. Through a motion for preliminary injunction and a preliminarily approved settlement, this litigation has accomplished each of these objectives and the parties now come before this Court seeking final approval.

A review of some of the accomplishments of the litigation and benefits of the proposed settlement help demonstrate that the settlement is indeed fair, reasonable and adequate to the class. Each of these have been ignored or misstated by the objectors to this settlement:

### A.    The Litigation Caused Defendant's Disclosure

After two months of litigation, plaintiff moved for a preliminary injunction seeking to force the disclosure of the database breach and notice to its customers advising them of the risks faced as a result of the breach. On the eve of the injunction's being heard in September 2007, defendant Ameritrade provided the notice long sought by class counsel on behalf of the class. Ameritrade issued a press release and spent millions of dollars providing direct notice to its over six million customers. This notice was one of the key elements of the relief sought in the Amended Complaint and, standing alone, provided a significant benefit for the class.

### B.    Discovery Demonstrated That Identity Theft Was Highly Unlikely

Discovery demonstrated the basis for Ameritrade's confidence that no Social Security numbers had been taken. As a result, the parties shared the perspective that a fair, reasonable and adequate settlement need not address identity theft but rather have outside testing prove that no identity theft had occurred and a framework for remuneration if the third party found otherwise.

1    The settlement before the Court provides precisely those elements. The settlement provided that

2    ID Analytics would serve as that third party and each of its tests performed to date confirm that

3    there was no identity theft. They are due to perform one additional test after final approval of the

4    settlement to demonstrate that there has been no instance of identity theft as a result of the breach.

5    Nothing in the record supports any other conclusion. Further, the settlement provides for a volun-

6    tary remuneration system for class members if ID Analytics were to find evidence of identity theft.

7    **C.    The Settlement Makes Defendant's Customer Data Safer**

8    The injunctive relief components make customer data safer by requiring Ameritrade to re-

9    tain a third party approved by Class Counsel to conduct penetration testing. Such testing has not

10   been performed by Ameritrade prior to this Settlement and to the knowledge of Class Counsel this

11   is the first class action settlement in which a defendant has agreed to have such testing performed

12   by a third party. Penetration testing is a reliable method to detect security weaknesses that would

13   allow an outside hacker to penetrate databases such as the one at issue in this litigation.

14   **D.    The Software Provided Is Appropriate Relief For Spam**

15   To Class Counsels' knowledge, no class plaintiff seeking damages for spam has ever pre-

16   vailed. Here, each class member is receiving security software for free with no strings attached. As

17   the record demonstrates, this is a valuable product for which Ameritrade has paid millions of dol-

18   lars and which is well-reviewed and not "free" software as several objectors have wrongly repre-

19   sented. Providing class members with this software is a fair, reasonable and adequate means to ad-

20   dress the harm suffered in the context of what could be achieved through further litigation.

21   **E.    The Reaction of the Market Further Shows that the Settlement Is Fair, Reasonable And Adequate**

22

23   As this Court has recognized, the market's reaction to a settlement can be probative. *Young*

     *v. Polo Retail, LLC*, 2007 WL 951821, *3 (N.D. Cal. 2007).  Here, direct notice was sent to over

24   six million of the customers of Ameritrade, which was every member of the settlement class. (An-

25   dreis decl.) Only 239 persons (less than .001% of the class) requested to be excluded from the

26   class.  Only 44 persons (less than .001% of the class) filed objections to the settlement. Of these,

27   several are either family members of other objectors, signatories of form letters, or federal inmates

28

1   who have been found in the past to abuse the judicial process. Of the objectors, only four are rep-

2   resented by counsel and submitted objections that cite legal authorities. None of the objectors

3   pointed to any authority showing a class recovering damages or obtaining injunctive relief in a

4   data breach case or even the certification of a class to pursue such claims on the merits. Of the

5   fifty attorneys' general given notice, only Texas made a substantive objection to certain provisions

6   of the settlement that were addressed prior to preliminary approval and now the Texas Attorney

7   General withdrew its objection.

8                                      * * *

9          For their efforts in accomplishing and achieving the benefits set forth above and detailed

10  herein, Class Counsel deserves to be compensated for their time. This case raised untested legal

11  theories and ultimately achieved a benefit for the class where other litigation has failed. Over the

12  past two and a half years, Class Counsel has expended 1,903.9 hours with a lodestar of

13  $720,432.98 calculated from the 2008/2009 Laffey Matrix. Based upon the fee agreed to through

14  mediation and the jurisprudence of this court, plaintiffs request an award of $1.800,857 in fees.

15  **II.    THE NOTICE DIRECTED TO THE CLASS COMPORTS WITH DUE PROCESS
            AND RULE 23**
16

17         Before final approval of a class action can issue, notice of the settlement must be provided

    to the class. Fed. R. Civ. P. 23(e)(1). Notice to the class must be "reasonably calculated under all
18
    the circumstances, to apprise interested parties of the pendency of the action and afford them an
19
    opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.
20
    306, 314 (1950).
21
           As further detailed in the declaration of Jeannine Andreis for the claims administrator,
22
    Rosenthal and Company, pursuant to this Court's Preliminary Approval Order (Dkt. No. 93), no-
23
    tice via email was provided to 2,121,430 class members.  An additional 4,293,655 class members
24
    were provided notice via postcard.  (Andreis decl., ¶¶5-9.)  Notice was also published in USA To-
25
    day on two occasions.  (*Id*. at ¶10.)  Further, a dedicated website address was created at
26
    www.stockspamsettlement.com for class members to learn more information about the settlement.
27
    (*Id*. at ¶11.)
28

1   This Court found at preliminary approval that such direct notice and notice by publication

2   would apprise the Class of the above-listed requirements of Rule 23 and due process. (Dkt. No.

3   93.)

4   **III.      THE SETTLEMENT WARRANTS FINAL APPROVAL**

5       The law favors the compromise of disputed claims. *Williams v. First Nat'l Bank*, 216 U.S.

6   582 (1910). "[T]here is an overriding public interest in settling and quieting litigation," and this is

7   "particularly true in class action suits." *Van Bronkhorst v. Safeco Corp*., 529 F.2d 943, 950 (9th Cir.

8   1976).  While a number of factors must be balanced when considering the final approval of a class

9   action settlement, courts in the Ninth Circuit presume fairness if the negotiations were at arm's

10   length, there was sufficient discovery, the counsel are experienced in similar litigation, and there

11   are only a small number of objectors. Alba Conte and Herbert B. Newberg, *Newberg on Class Ac-*

12   *tions* § 11:41 (4th Ed. 2009); *Hanson v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

13       As provided above, the Settlement Agreement was reached by experienced counsel with

14   sufficient discovery and only after extensive arm's length negotiations. Accordingly, the Court's

15   analysis of the factors listed below should be examined with a presumption that the settlement

16   agreement is fair.

17       It is well-settled that in analyzing the fairness, reasonableness, and adequacy of a class ac-

18   tion settlement, the Court may consider the following non-exhaustive list of factors: "(1) the

19   strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litiga-

20   tion; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in

21   settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experi-

22   ence and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of

23   the class members to the proposed settlement." *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir.

24   2003); *see also In re OmniVision Tech. Inc.*, 559 F. Supp. 2d 1036, 1040-1041 (N.D. Cal. 2008).

25   This Court has added to these factors "(9) the procedure by which the settlements were arrived at,

26

27

28

1    see Manual for Complex Litigation (Fourth) § 21.6 (2004), and (10) the role taken by the plaintiff

2    in that process." *Young v. Polo Retail*, *supra*, 2007 WL 951821 at *3 (N.D. Cal. 2007)

3          **A.      The Strength of the Plaintiffs' Case**

4          "Basic to [analyzing a proposed settlement] in every instance, of course, is the need to

5    compare the terms of the compromise with the likely rewards of the litigation." *Protective Comm.*

6    *for Indep. Stockholders v.* Anderson, 390 U.S. 414, 424-25 (1968). Class Counsel are confident in

7    the strength of the Plaintiffs' claims; however, they are also cognizant of the legal uncertainty in

8    this litigation that would be present absent the instant Settlement Agreement.

9          The strength of plaintiffs' case was immediately subjected to test by Ameritrade with a

10   motion to dismiss. (Dkt. No. 13.) In their motion to dismiss, Ameritrade argued that (1) plaintiffs'

11   claims are subject to a Nevada choice of law clause which precluded the California law based

12   causes of action; (2) the Securities Litigation Uniform Standards Act of 1998 preempts plaintiffs'

13   state law claims; (3) plaintiffs failed to allege "damage" within the meaning of the California Con-

14   sumer Legal Remedies Act or Business & Professions Code Sec. 17200, causation or a violation of

15   the CLRA; (4) plaintiffs failed to allege the breach of a fiduciary duty; (5) plaintiffs failed to state

16   a claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. Sec. 1030, and (6) plaintiffs

17   failed to allege a violation of the Can Spam Act, 15 U.S.C. sec. 7704(A)(1). (*Id.*) Plaintiff counsel

18   marshaled their arguments supporting the complaint against the motion. (Dkt. No. 28.) Ameritrade

19   filed a reply brief (Dkt. No. 30). Ameritrade placed much emphasis on it's assertion that plaintiffs

20   had not expended money, lost money or been denied money due to the stock spam. Ameritrade has

21   also placed much emphasis in this litigation on it's contention that damages are not available to

22   persons for the increased risk of identity theft.  The motion hearing date taken off calendar to per-

23   mit the parties to more fully analyze settlement possibilities. (See Dkt. No. 35.)

24         Although the parties settled before the Court issued an order on Ameritrade's motion to

25   dismiss, based on the foregoing, Plaintiffs' Counsel anticipate that Ameritrade would have

26   mounted a strong attack on plaintiffs' ability to establish damages as well as causation during the

27   ongoing litigation and upon summary judgment. Additionally, prior to beginning any settlement

28   discussions, Plaintiff Counsel deposed William Edwards, Ameritrade's Chief Security Officer with

1   respect to the data breach issue. This deposition confirmed that additional challenges existed

2   which were not previously known.

3        Given the novelty of Plaintiffs' claims and the assuredly vigorous defense (See Ameri-

4   trade's analysis of why it contends plaintiffs suffered no damages and why it contends that the in-

5   creased risk of identity theft is not a compensable injury, Dkt. No. 67, pp. 2-4), Plaintiffs' case is

6   not so strong that the settlement is unreasonable. Accordingly, this factor favors approval of the

7   settlement.

8        **B.**     **The Risk of Continued Litigation**

9        The next factor this Court must consider is "the risk of continued litigation balanced

10  against the certainty and immediacy of recovery from the Settlement." *In re OmniVision*, 559, F.

11  Supp. 2d at 1041 (citing *Dunleavy v. Nadler*, 213 F.3d 454, 458 (9th Cir. 2000)). "The Court

12  should consider the vagaries of litigation and compare the significance of immediate recovery by

13  way of the compromise to the mere possibility of relief in the future, after protracted and expen-

14  sive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospec-

15  tive flock in the bush." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).

16       Here, the risk, expense, complexity and likely duration of the litigation fully support the

17  Settlement. As set forth above, Plaintiffs faced risks of dismissal at the pleading stage and in prov-

18  ing liability and damage at trial. Also, because it would be necessary to undertake full document

19  and deposition discovery, expert discovery, and dispositive motion practice at the conclusion of

20  discovery, this case could easily require an additional two-three years to reach a conclusion. Addi-

21  tionally, due to the inherent risky nature of trials in general, it is impossible to predict how a trier

22  of fact will construe the evidence and testimony. As such, the substantial and immediate relief

23  provided to the Class under the Settlement weighs heavily in favor of its approval compared to the

24  inherent risk of continued litigation, trial, and appeal.

25       **C.**     **The Risk of Maintaining Class Action Status**

26       If The Court's May 1, 2009 Order certified a nationwide class for settlement purposes only.

27  (Dkt. 93.) However, if the Court fails to grant final approval to the Settlement Agreement for any

28  reason, the certification of the class will automatically become void. Although Plaintiffs and Class

1    Counsel believe they would be successful in obtaining certification of an adversarial class absent

2    the Settlement Agreement, Defendants have made it clear that in its absence they would vigor-

3    ously oppose adversarial certification. (See Dkt. No. 67, p. 6.) Further, even if Plaintiffs were suc-

4    cessful in a motion for class certification absent the Settlement Agreement, Defendants could

5    move for decertification of the class before or during trial and likely would challenge certification

6    on appeal. Accordingly, this factor weighs in favor of approving the Settlement Agreement, be-

7    cause if at any point the Class failed to become certified or if certification was reversed, the Class

8    would get nothing.

9         **D.       The Amount Offered in the Settlement**

10        The next factor relevant to a consideration of the reasonableness of the Settlement Agree-

11   ment is the amount offered by Defendants. There are various methods to value this settlement. At

12   the time the settlement agreement was signed, the software component of the settlement sold for

13   between $9.99 and $69.99. (See Dkt. 66-3, p. 3-4.) If one discounts the software's resale value to

14   $10.00, with more than six million class members, the resale value of the Settlement's software

15   component could exceed $60 million. Retail value is an appropriate measure of what the settle-

16   ment is worth to the class. *See, e.g. O'Keefe v. Mercedes-Benz USA, LLC*. 214 F.R.D. 266, 304

17   (E.D. Pa. 2003) (noting that "[t]he settlement fund should be based on the benefit to the class and

18   not the cost to the defendant"); *Duhaime v. John Hancock Mut. Life Ins. Co.* 177 F.R.D. 54, 71 (D.

19   Mass. 1997) (noting that "the value of a settlement should not be measured by its cost to the de-

20   fendant, but by its benefit to the class"); *In re Prudential Ins. Co. of Am. Sales Practices Litig.* 962

21   F. Supp. 450,557 (D. N.J. 1997) (noting that "[t]he cost of the relief to [defendant] is not the

22   measure of class member benefit. The value of the relief to the Class, which maybe substantial, is

23   what matters") (citation omitted); *Shaw v. Toshiba Am. Infos. Sys., Inc.*, 91 F. Supp. 2d 942, 960

24   (E.D. Tex. 2000) (stating that "[t]he in-kind relief made available... provides significant value to

25   class members"); *In re Domestic Air Transp. Antitrust Litig.* 148 F.R.D. 297, 304 (N.D. Ga. 1993)

26   (noting the "face value" of the certificates being distributed); *In re Cuisinart Food Processor Anti-*

27   *trust Litig.* M.D.L. 447, 1983 WL 153, *2 (D. Conn. Oct. 24, 1983) (noting the value of the cou-

28   pons to be given away in terms of the discount they would provide off of "the suggested retail

1   price")  The contentions of certain objectors that the software is free or without value are wholly

2   without merit, unsupported by any evidence, and directly contradicted by submissions that have

3   already been made to this Court.

4         Ameritrade proffered evidence that it spent over $6 million on the software component of

5   the settlement. (Dkt. No. 67-4, p. 5, ¶11.) There is also evidence that Ameritrade spent over

6   $100,000.00 on ID Analytics to perform the penetration tests along required in the Settlement.

7   (Dkt. No. 74, p. 9, fn. 7.) In addition, TD Ameritrade will be donating $55,000 to two cyber-

8   security projects. (Dkt. No. 90-3, p. 14, ¶IV.A.9.) As such, the amount of settlement favors ap-

9   proval of the parties' agreement.

10        **E.       The Extent of Discovery Completed**

11        The next factor requires the Court consider both the extent of the discovery conducted to

12   date and the stage of the litigation as indicators of class counsel's familiarity with the case and

13   ability to make informed decisions. *In re OmniVision*, 559 F. Supp. 2d at 1042 (citing *Dunleavy*,

14   213 F.3d at 459). Prior to entering into settlement negotiations, the parties had fully briefed plain-

15   tiffs' motion for preliminary injunction and defendant's motion to dismiss. Additionally, plaintiffs'

16   counsel had deposed William Edwards, Ameritrade's Chief Security Officer, and learned the de-

17   tails of Ameritrade's computer security systems which lie at the heart of its ability to protect con-

18   sumer information. This along with Class Counsel's pre-suit investigation, allowed Class Counsel

19   to be adequately familiarized with the case and to effectively negotiate the merits of the Settlement

20   Agreement. Accordingly, this factor too favors approval of the Settlement.

21        **F.       The Experience and Opinion of Counsel**

22        The sixth factor has the Court consider Class Counsel's experience and views about the

23   adequacy of the Settlement. *See In re OmniVision*, 559 F. Supp. 2d at 1043. In fact, "[t]he recom-

24   mendations of plaintiff's counsel should be given a presumption of reasonableness." *Id.* (quoting

25   *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). Reliance on such recommenda-

26   tions is premised on the fact that "parties represented by competent counsel are better positioned

27   than courts to produce a settlement that fairly reflects each party's expected outcome in the litiga-

28   tion." *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). Class Counsel KamberE-

delson, LLC was actively involved in the litigation of this matter and has extensive experience in prosecuting consumer class action lawsuits of dealing with computer security issues. (Kamber decl., Ex. 1.) Through their investigation, litigation, negotiation, and settlement Class Counsel have an intimate understanding of the instant litigation and believe the settlement to more than exceed the "fair, adequate, and reasonable" standard required for the Court's approval. (See Dkt. No. 66-2, p. 3, ¶3.) This fact, therefore, also favors the Court's final approval of the Settlement Agreement.

### G.    The Presence of a Governmental Participant

After defendant provided the required CAFA notification to potentially interested governmental entitles, only the Texas Attorney General submitted an objection to the settlement. (Dkt. No. 93, pp. 13-17.) The parties spent approximately four months with one in-person and many subsequent telephonic discussions with the Texas Attorney General's Office to address concerns. As this Court noted, after theses discussions, the parties amended the settlement agreement as well as the proposed notice in a number of respects. (See Dkt. No. 93, p. 5.) The final settlement agreement and notice were preliminary approved by this Court and based thereon notice was provided to the class. Given the changes to the settlement agreement, this factor supports approval of the settlement.

### H.    The Procedure by which the Settlement was Arrived At

The proposed settlement here is the result of thorough investigation and extensive arms-length negotiations that took place over the course of several months. Plaintiffs' counsel conducted a detailed investigation into the facts and law relating to the matters alleged in the operative complaint. Because this investigation occurred both prior to the filing of the original complaint, and continued through the settlement negotiations, plaintiffs' counsel were fully informed when negotiating the settlement agreement. The parties' settlement negotiations culminated in a mediation before the Honorable Richard E. Neville, a retired Illinois state court judge who is now a JAMS mediator, on January 15, 2008. The parties negotiated attorneys' fees only after they had agreed on all of the other material elements of the settlement.

**I.     The Role Taken by the Plaintiffs in the Process**

Plaintiff Joel Griffiths is a Senior Linux Engineer at a major domain name registrar. (Griffiths decl., Dkt. No. 66-6, p. 3, ¶4.) Brad Zigler is a noted financial writer who developed a prominent stock index and writes and speaks on commodities. (Zigler decl., Dkt. No. 66-4, p. 3, ¶¶3-8.) Each of these plaintiffs was kept fully informed of the case by Counsel and supports the settlement agreement. (Dkt. No. 66-6, p. 4, ¶¶9-12; Dkt. No. 66-4, pp. 4-6, ¶¶13, 15-20.) Each of these plaintiffs are intimately familiar with the facts of the case. (*Id.*) Mr. Zigler was so concerned with the issues raised by the lawsuit that, once he learned of the lawsuit, he sought counsel and asked to be directly involved in the litigation. (Dkt. No. 66-4, p. 4, ¶11.) Mr. Griffiths sought out counsel after he determined that Ameritrade leaked his email address. (Dkt. No. 66-6, p. 4, ¶8.) These plaintiffs were informed of the negotiations leading up to the signing of the settlement and have personally reviewed and approved it. (Dkt. No. 66-6, p. 4, ¶¶9-12; Dkt. No. 66-4, pp. 5-6, ¶¶15 and 20.)

Mr. Elvey has clearly taken a role in the litigation and settlement. However, his conduct has placed his own idiosyncratic views and personal agenda above his fiduciary duties to absent class members. (See summary of Mr. Elvey's conduct, Dkt. No. 66, pp. 19-20.) Mr. Elvey's goal's ignored his counsel's evaluation of the risks of litigation and fail to place the appropriate value on the benefits that the settlement provides. Mr. Elvey's grounds for an increased settlement value ignore established legal principles. Notably, Mr. Elvey has sought new counsel to litigate this case further and has found none. (Dkt. No. 87, pp. 31-32.) Even the counsel who represent him on his objection refuse to represent the class in further litigation. (*Id.* at pp. 4-5.)

**J.     The Reaction of Class Members**

The final factor in the Court's determination of the fairness, adequacy, and reasonableness of the Settlement Agreement is the reaction of the class to the settlement. *Molski,* 318 F.3d at 953. "It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528-29 (C.D. Cal. 2004).

### (1) Requests to Opt Out

In this case, the court-approved notice procedures utilized by the parties sent direct notice to 6,415,085 potential class members.

Based on the filings, 239 persons requested to be excluded.  (See Parisi decl., Ex. 1.)  This small number of class members requesting exclusion from the class further weighs in favor of approval of the Settlement. *See Wilson v. Airborne, Inc.*, 2008 WL 3854963, at * 7 (C.D. Cal. Aug. 13, 2008) (approving settlement where 230 timely requests for exclusion were received out of a class of 282,717 members); *Churchill Village v. General Electric*, 361 F. 3d 566, 577 (9th Cir. 2004) (settlement approved with 500 opt-outs out of approximately 90,000 class members).

### (2) Objections[2]

A total of 44 persons filed objections. (Parisi decl., Exh. 2.) This includes Mr. Elvey and his parents, several objectors duplicating Mr. Elvey's objections, as well as a federal inmate who has been cited as the most litigious persons in history. The fact that less than one percent of Class Members objected to the Settlement should weigh heavily in favor of the Court approving this Settlement. *See Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) (fact that only three out of 2,500 class members maintained objections to the settlement showed an "overwhelming sentiment of the class in favor of the [d]ecree, a factor which provides strong support for the fairness of its terms"); *Boyd v. Cechtle Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (finding that objections from only 16 percent of the class was persuasive that the settlement was adequate). A finding of fairness, adequacy, and reasonableness does not require zero objections to the class action settlement. Here, the minimal number and cursory nature of the written objections received to date weighs strongly in favor of the Settlement.

One prefatory observation is in order. The objections received are largely based on speculations, opinions, suspicions and innuendos, not hard facts. None of the objections raises a single new fact or provides any evidentiary support for these reiterations of earlier arguments and form

---

[2] Most of the issues raised by the objectors have previously been addressed, see e.g., Dkt. Nos. 66, 67, and 74.

objections. In fact, the short response to all of these objections should be the same as made by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir. 1974):

> In general the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections, and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior litigation and extensive pre-trial proceedings. To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process. On their theory no class action would ever be settled, so long as there was at least a single lawyer around who would like to replace counsel for the class and start the case anew. To permit the objectors to manipulate the distribution of the burden of proof to achieve such an end would be to permit too much.

With this point in mind, Class Counsel will respond to the various objections.

     **a)** **Objection that the settlement provides no remedy for identity theft.** Mr. Elvey appears to make his primary objection that the settlement does not remedy identity theft. (Dkt. No. 152, p. 12.) Mr. Elvey, however, presents no evidence to counter Ameritrade's evidence that no evidence of identity theft exists. This is the same point that Mr. Elvey made without support in his submissions opposing preliminary approval.

     **b)** **Objection that settlement fails to take scope of breach into account.** Mr. Elvey predicates a number of objections on his contention that intruders acquired sensitive identifying information, other than email addresses, from Ameritrade's customer database. (*See, e.g.*, Elvey Obj., Dkt. No. 152 p. 8, where Elvey states: "[T]he scope of the data breach went far beyond email addresses, giving hackers access to the sensitive data of six million Ameritrade clients, including Social Security numbers, birth dates, account numbers, phone numbers, and addresses"; *see also Id.* 3, 9.) Based on that assertion, he argues that the security measures, notices, and identity theft redress provided by defendant under the settlement agreement are inadequate to address past and future consequences for the class members.

     Indeed, as Mr. Elvey correctly notes, the complaint in this matter alleged upon information and belief that sensitive information besides email addresses was acquired by intruders. (*See* Elvey Obj., Dkt. No. 152 pp. 21-22.) However—fortunately—subsequent disclosures in the record of

1    this matter provide no basis for continuing to assert the intruders acquired anything besides email

2    addresses and other contact information.

3        To the contrary, defendant attests that the forensics examination performed by Mandiant, a

4    well-regarded information security consultancy, revealed no evidence of the unauthorized acquisi-

5    tion of sensitive customer information such as Social Security numbers and dates of birth. (Defen-

6    dant's Response to Court Order of June 13, 2008, Dkt. No. 67 p. 4.) Defendant has continued to

7    validate its findings with account-seeding to detect uses of customer data and analysis performed

8    by ID Analytics to seek to identify relevant instances of identity theft by examining a broad credit

9    transactions environment. Other than the sole, reported symptom of unsolicited stock-touting

10   email messages, these inquiries have yielded no evidence of unauthorized use of Ameritrade cus-

11   tomer data.

12       Accordingly, Mr. Elvey's objection is unfounded when he claims that Defendants' notice is

13   insufficient in that it "buried the fact that Social Security numbers were exposed in the middle of

14   the notice," or that "[t]he notice did not mention other data, including at least birth dates, names,

15   phone numbers, addresses, and account numbers." (*See* Elvey Obj., Dkt. No. 152 p. 8 of 29.)

16   There are no facts to support this objection.

17       *c)  Objection that investigation and investigative disclosures are insufficient.* Mr. Elvey

18   complains that Ameritrade has presented no evidence that ID Analytics' reports have been ac-

19   cepted into evidence in a court of law. (Elvey Obj., Dkt. No. 152 p. 13 of 29.) Ameritrade has

20   made ID Analytics' credentials part of the record in this matter, and Mr. Elvey has no basis for

21   choosing prior admissibility into evidence as the touchstone for validating the services a company

22   provides. As for his objection that ID Analytics has not made a finding "that identity theft has or

23   will not occur" (Elvey Obj., Dkt. No. 152 p. 14 of 29), the utility of ID Analytics' services in look-

24   ing for positive evidence of identity theft is apparent on its face; the fact that ID Analytics does not

25   offer to predict the negative is irrelevant and has no bearing on the value of the services it does

26   provide.

27       Mr. Elvey also objects to the fact that more detailed reports of forensics findings have not

28   been disclosed to class members. (Elvey Obj., Dkt. No. 152 p. 13 of 29.) Counsel is unaware of

1  any instances in which courts or government enforcement personnel have called upon companies

2  that experienced breaches to disclose technical details of how those breaches occurred—with good

3  reason, given the potential for further security compromise that would be abetted by such disclo-

4  sure.

5      ***d)  Objection that Ameritrade's security measures called for in settlement are inade-***

6  ***quate***. Mr. Elvey objects to the Ameritrade security measures prescribed in the settlement, arguing

7  that they afford no relief to the extent they are already being performed (Elvey Obj., Dkt. No. 152

8  pp. 14-15 of 29) and that they fail to meet the standards for financial services companies, or the

9  standards set by the Federal Trade Commission in its settlement with TJ Maxx (Elvey Obj., Dkt.

10  No. 152 pp. 15-16 of 29). However, to the extent that the settlement agreement incorporates secu-

11  rity measures that Ameritrade is now performing and that it would not otherwise be *obligated* to

12  perform, consumers benefit in that Ameritrade has committed to continue performing them. Fur-

13  ther, it should be noted that nothing in the settlement agreement states the security measures it pre-

14  scribes are to the exclusion of other security measures it is already legally obligated to undertake

15  as a financial services company. Unlike the FTC's settlement with TJ Maxx, which is not a finan-

16  cial services company, it would serve no purpose to incorporate into a settlement agreement those

17  security measures which, as a financial services company, Ameritrade is already obliged to im-

18  plement.

19      ***e)  Objection that Class Counsel obtained no benefit for the class***. Mr. Elvey and others

20  have suggested that class members are in virtually the same position with or without a settlement.

21  This is not correct. In addition to the software component of the settlement which has already been

22  addressed at length in these papers and at the time of preliminary approval, the settlement provides

23  injunctive relief to better protect customer data in the future as well as a remediation process in the

24  unlikely event that ID Analytics finds identity theft as a result of the breach.

25      The injunctive relief components make customer data safer by requiring Ameritrade to re-

26  tain a third party approved by Class Counsel to conduct penetration testing. Such testing has not

27  been performed by Ameritrade prior to this settlement and to the knowledge of Class Counsel this

28  is the first class action settlement in which a defendant has agreed to have such testing performed

1    by a third party. Penetration testing is a reliable method to detect security weaknesses that would

2    allow an outside hacker to penetrate databases such as the one at issue in this litigation.

3           Further, the remediation process provides class members a mechanism outside arbitration

4    to detect and prove that Ameritrade's security breached actually caused any possible their identity

5    theft loses. (Settlement ¶¶IV.A.5, IV.A.6, Dkt. No. 90-3.) The cost of this detection service cost

6    Ameritrade over $100,000.00. (Dkt. No. 74, p. 12 of 16, fn. 7.) In a world where companies often

7    deny that they caused a loss, absent the settlement, class members would have to demonstrate that

8    the security breach at Ameritrade, as opposed to some other source, was the source in their

9    claimed identity theft loss. Thus, without the settlement, class members who may suffer identity

10   theft as a result of Ameritrade would be forced to prove causation. *See Stollenwerk v. Tri-West*

11   *Health Care Alliance*, 254 Fed.Appx.664, 668 (9th Cir. 2007). However, the Settlement eliminates

12   this burden of proving causation. (Settlement ¶¶IV.A.5, IV.A.6, Dkt. No. 90-3.) As part of the set-

13   tlement, ID Analytics will identity any class members whose "information may have been subject

14   to organized misuse" 'involving data contained in the Company's database that was the subject"

15   the security breath. (*Id*.) If a casual link to the security breach is detected, the identified class

16   members will have access to a dedicated customer support "trained to help remediate any harm

17   from any identity theft" (Settlement ¶IV.A.7(a).) This is valuable because identity theft victims'

18   losses, especially the time associated with remediating the identity theft, are very often nonmone-

19   tary. *U.S. General Accounting Office, Identity Theft: Prevalence and Cost Appear to be Growing*

20   56 (GAO-02-363 2002); *see also* 2006 Identity Theft Survey Report at 37-39 (discussing large

21   percentages of victims having reported no monetary loss); see Zigler Decl. ¶¶18-19, Dkt. No. 66-

22   5, pp. 5-6. Given the general absence of monetary losses, providing dedicated and trained cus-

23   tomer assistance is a more direct and efficient way of remedying these damages than monetary

24   compensation.

25

26

27

28

Additionally, in the instances where a class member suffered monetary losses, the Settlement affords Class members a claims procedure for seeking redress.[3] TD Ameritrade must provide "reasonable" offers of compensation to Class members who submit a claim. (Settlement ¶ IV.A.7(b), (c).) Further, Class members retain their right to bring individual arbitration claims under the FINRA regulations irrespective of whether they receive an offer from TD Ameritrade. (Settlement ¶ IV.A.7(d).)  Where ID Analytics demonstrates causation, Class members need only prove their damages on their identity theft claim. As the identity theft damages attributable to the TD Ameritrade security breach will vary from Class member to Class member, Class members' individual damages will be resolved on an individual basis. The FINRA arbitration process is better suited for this type of claims resolution–the process does not require the hiring of attorneys and the filing fees are equivalent to or lower than most court fees. Thus, the Settlement provides a net gain to Class members.

     *f)  **Objection that the burden on Ameritrade is either too small or too large.*** Evidencing that the settlement benefit is appropriate is the fact that there are objections stating that the burden placed on Ameritrade is too large and those saying it is too small. For instance, objectors Brad Richards and Theodore Frank, represented by the Center for Class Action fairness, contend that the lawsuit has no merit and a settlement therefore harms the interests of the class members. (Dkt. No. 150, p. 9 of 12.) On the other hand, objectors such as Marcel M. Cary (Dkt. No. 109), Jack G. Simke (Dkt. No. 118) and Mr. Elvey contend that the settlement places too small a burden on Ameritrade.

     *g)  **Objection with regard to the cy pres recipients.*** There were also objections relating to the *cy pres* donations. However, the donation is of an amount that would be impractical to distribute to a class of over six million. *In re Wells Fargo Securities Litigation*, 991 F.Supp. 1193 (N.D.

---

      [3]     Identity theft victims' cash expenses for remediating their losses are relatively small, because they are generally not held liable for fraudulent debts. *See* 2006 Identity Theft Survey Report at 37 (in most expensive category of identity theft, 75 percent of victims reported monetary loss under $1,000); *Identity Theft: Prevalence and Cost Appear to be Growing*, 56-57 (only 2.8 percent of identity theft victims reported monetary losses in study, and 1.9 percent of victims reported losses under $1,000).

1   Cal. 1998). In addition, the charities receiving the donations were chosen because they best serve

2   the intent of the settlement. *Id.* It is not in the best interest of the class to donate to each class

3   member's choice of charities.

4           **h)  *Objection that settlement fails to adequately compensate class members.*** As dis-

5   cussed above on page 14, Elvey's objection that the settlement agreement includes no compensa-

6   tion for class members is inaccurate. Despite the lack of evidence so far indicating that identity

7   theft has been or will be an outgrowth of the intrusion, Ameritrade does provide a claims process

8   that includes financial compensation for losses, as well as an arbitration backstop. To the extent

9   Elvey takes the position that Ameritrade should compensate Class Members regardless of whether

10  they suffered any pecuniary harm (see, *e.g.,* Elvey Obj., Dkt. 152, p. 11, 21), this position is not

11  supported by history of data-loss cases that have, unsuccessfully, proceeded further in litigation.

12  Courts have frequently dismissed data-loss cases for lack of standing and failure to state a claim,

13  finding that the risks attending loss of personal data did not represent injury-in fact or that the al-

14  legations of identity theft risks and costs of identity prevention did not represent present harm. *See*

15  *Ruiz v. Gap, Inc.*, 622 F.Supp.2d 908 (N.D.Cal. 2009) (summary judgment dismissal of claims in-

16  cluding negligence, violation of California Social Security Number privacy law, and other claims,

17  in case in which job applicant's identifying information, including Social Security number, were

18  on stolen laptop) (citations); *Ruiz v. Gap*, 540 F.Supp.2d 1121 (N.D.Cal., 2008) (dismissal on

19  pleadings and for failure to state claims for California Unfair Competition Law and violation of

20  California Constitution's right to privacy).

21          In *Cherny v. Emigrant Bank*, 604 F.Supp.2d 605 (S.D.N.Y. 2009), with facts very similar to

22  those of the instant matter, a plaintiff who alleged he received spam at an email account he had

23  create specifically for communications regarding his Emigrant Online bank account. In dismissing

24  the amended complaint for failure to state a claim upon which relief could be granted, the court

25  held that that the disclosure of the plaintiff's email address did not constitute tangible harm. Sig-

26  nificantly, in *Cherny v. Emigrant*, the plaintiff also alleged the likelihood that more sensitive iden-

27  tifying information co-resided in the database from which his email address was stolen. *Id*., 604 F.

28  Supp. at 608-09; *see also Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629 (7th Cir. 2007) (although

1  plaintiff had standing in case where intruders stole account information, plaintiff did not state a

2  claim for cognizable injury); *Key v. DSW, Inc.,* 454 F.Supp.2d 684, 690 (S.D.Ohio 2006) (identity

3  theft risk following breach was not is not an actual or imminent injury in case where insecurely re-

4  tained credit and debit information of 96,000 customers was stolen).

5  Nor have courts tended to recognize the costs of credit monitoring as deserving of relief,

6  where the costs were incurred to address potential identity theft. *See Shafran v. Harley-Davidson,*

7  *Inc.,* No. 07 Civ. 01365, 2008 WL 763177, at *3 (S.D.N.Y. Mar. 20, 2008) ("[c]ourts have uni-

8  formly ruled that the time and expense of credit monitoring to combat an increased risk of future

9  identify theft is not, in itself, an injury the law is prepared to remedy").

10  In the *Cherny v. Emigrant* case, addressing the unsolicited commercial email messages

11  plaintiff received at his email address uniquely tied to his bank account, the court held that receipt

12  of spam does not constitute an injury warranting compensable relief. *Id.*, 604 F.Supp. at 609 (cit-

13  ing *Burgess v. Eforce Media, Inc.,* No. 1:07CV231, 2007 WL 3355369, at *6 (W.D.N.C. Nov. 9,

14  2007) ("the end internet user has no legal recourse for such frustration"); *see also Bell v. Acxiom*

15  *Corp.*, No. 06-0485, 2006 WL 2850042, at *1-2 (E.D.Ark. Oct. 3, 2006) (dismissal for lack of

16  standing where hacker sold personal information to marketers and plaintiff alleged risk of junk

17  mail and identity theft).

18  *i)  Objection that the settlement is not as good as that in TJX.* Those objectors, including

19  Mr. Elvey, who cite to the Federal Trade Commission's settlement with the TJX as a standard to

20  which this action should be compared, miss the mark. See *In the Matter of TJX Companies*,

21  Agreement Containing Consent Order, U.S. Federal Trade Commission, File No. 072 3055, Mar.

22  27, 2008, downloaded August 20, 2008 from

23  *http://www2.ftc.gov/os/caselist/0723055/080327agreement.pdf*, including the basic information

24  security program requirements embodied in the consent order, *id.* at 3-4. TJX is a retailer, not sub-

25  ject as Ameritrade is to the security requirements promulgated under the Gramm-Leach-Bliley

26  Act, 15 U.S.C. Subchap. I, Secs. 6801-6809. See Regulations S-P: Privacy of Consumer Financial

27  Information; Procedures to safeguard customer records and information, 17 C.F.R. Part 248, §

28

1    248.30. Thus, it made sense for the FTC to incorporate such requirements into a settlement agree-

2    ment, whereas, for Ameritrade, any such requirements would be surplusage.

3          In addition, the facts of the TJX case bear little relationship to this matter. In TJX, the FTC

4    found that the company was, in fact, failing to follow minimal, information security standards and

5    perpetrated a breach that compromised millions of payment cards, resulting in tens of millions of

6    dollars in fraudulent charges and compromising almost half a million consumers personal informa-

7    tion, including Social Security and drivers' license numbers. *In the Matter of TJX Companies*,

8    Complaint, U.S. Federal Trade Commission, Docket No. C-4227, Aug. 1, 2008, downloaded Au-

9    gust 20, 2008 from *http://www2.ftc.gov/os/caselist/0723055/080801tjxcomplaint.pdf.* In civil liti-

10   gation, the consumer track settlement in *In re TJX Companies Retail Security Breach Litigation*

11   (D. Mass, Case No. 07cv10162) arose from the same operative facts. In contrast, in this action

12   against Ameritrade, there is no evidence that Social Security numbers or credit or debit card identi-

13   fiers were acquired, there is no evidence of identity theft, and there is no evidence of consumers or

14   the institutions that serve them incurred any fraud remediation costs.

15         ***j)   Objection that this case should have been resolved like the Veterans Affairs case.*** In

16   the Veterans Affairs case it is alleged that a stolen laptop—later recovered—contained names,

17   Social Security numbers, dates of birth, and disability ratings for up 17.5 million veterans, their

18   spouses, and other military personnel. In re: Dept of Veterans Affairs Data Theft Litigation, MDL

19   1796 (D.D.C. Case No. 06mc506). A final fairness hearing was held on July 28, 2009 regarding

20   the proposed settlement, which compensates affected class members for physical manifestations of

21   severe emotional distress and in amounts between $75 and $1,500 for out-of-pocket expenses for

22   credit monitoring and identity theft protection. (Id., Dkt. 53-2, filed Jan. 27, 2009.) The unique re-

23   lationship of plaintiffs and the defendant institution plus the confirmed loss of Social Security

24   numbers and birthdates appear to bear on the credit monitoring/identity theft protection compensa-

25   tion and distinguish Veterans Affairs from the instant matter.

26         ***k)   Objection that the schedule Ordered by the Court did not allow the parties sufficient***

27   ***information to object to the request for attorney fees.***

28

1    Class member Weinstein contends that she was not provided sufficient notice of Class Counsel's

2   request for attorney fees because she was ordered to file her objection before Class Counsel was

3   ordered to file its motion requesting an award of attorney fees. (See Dkt. No. 149.) Ms. Weinstein

4   places great emphasis on a misreading of the notes of the Advisory Committee notes to Fed.

5   R.Civ.P.23(h)(1) which she contends require that Class Counsel's attorney fee motion be filed be-

6   fore she must file an objection. The objector, however, misreads the notes. The Advisory Commit-

7   tee notes only suggest that "*notice* of class counsel's fee motion should be combined with notice of

8   the proposed settlement . . . ." Fed. R. Civ.P.23(h)(1) Advisory Committee Notes. In fact, Class

9   Counsel has found no case holding otherwise that an attorney fee motion must be filed prior to the

10  date objections. The one case which the objector suggests arrives at such a holding, *GMC Pick-Up*

11  *Truck*, 55 F.3d 768, 803 (1995), only disapproved of the practice where the notice to the class fails

12  to advise the class of the *amount* of fees sought by Class Counsel.

13      *l)   Objectors Ned Colletti and Jonathan Lee Riches.* These two individuals moved to in-

14  tervene and objected. According to one internet site, Mr. Riches is in the Guinness Book of World

15  Records for being the most litigious individual in history, and is incarcerated at Federal Transfer

16  Center in Oklahoma City. http://en.wikipedia.org/wiki/Jonathan_Lee_Riches . Mr. Colletti, who

17  joined Mr. Riches, listed his phone number as that of the White House.

18      *m)  Objection that the Trend Micro software is "dangerous."*  One objector relies on an

19  article in PC World and contends that the Trend Micro software is dangerous. (See Dkt. No. 151.)

20  The objector fails to mention the many positive reviews of the software. *PC Magazine* found that

21  software "very good". *http://www.pcmag.com/article2/0,2817,2331117,00.asp*. *Top Ten Reviews*

22  found the software to be an "above average program that offers everything you will need to stay

23  safe while surfing the web." *http://internet-security-suite-review.toptenreviews.com/pc-cillin-*

24  *review.html*. *CNET* reviewed the non professional version (the professional version is offered to

25  class members) and found it "very good." *http://reviews.cnet.com/internet-security-and-*

26  *firewall/trend-micro-internet-security/4505-3667_7-33303136.html*. *Computer Shopper* rates the

27  software 7 out of a possible 10. http://computershopper.com/software/reviews/trend-micro-

28  internet-security-pro. *LapTop* gives the software ranks the software 4 out of a possible 5.

1    *http://www.laptopmag.com/review/software/trend-micro-internet-security-pro.aspx*. Respectfully,

2    one magazine article is not grounds to reject approval of the settlement with respect to the soft-

3    ware component.

4           **n)  Objection that the Trend Micro software has no value and Ameritrade paid nothing**

5    **for it.** This objection is not supported by the facts. Ameritrade spent over $6 million on the soft-

6    ware component of the settlement. (Dkt. No. 67-4, p. 5, ¶11.)

7           **o)  Objection that it was unlawful and contrary to *Devlin v. Scardelletti*, 536, U.S. 1**

8    **(2002) to require objectors to make written objections.** This is incorrect. The *Devlin* Court held

9    that unnamed class members who timely object are proper parties to an appeal of the approval of

10   the settlement. *Id*. at 10-11. The opinion did not state that courts may not require written objec-

11   tions. (*See In re Integra Realty Resources, Inc.,* 354 F.3d 1246, 1247-1248 (relying on *Devlin*,

12   found failure to file written objection precludes right to appeal).

13          **p)  Objection that the scope of the release agreement is too broad.**  There are some objec-

14   tions to the breadth of the release agreement given that the release extinguishes those claims that

15   were actually brought and those that "could have been asserted" in light of the facts alleged in the

16   complaint.  The release is further challenged on the ground that the settlement permits individual

17   claims for damages but prohibits future actions for injunctive relief.  Such objections are without

18   merit.  First, the release provisions of the settlement are fairly standard.  Such language is rou-

19   tinely utilized both in and out of the class action context.  *See, e.g., In re Avista Corp. Sec. Litig.,*

20   2007 WL 4568933, *3 (E.D. Wash.) (granting final approval of class settlement which released

21   causes of action that were or "could have been asserted"); In *re Janney Montgomery Scott LLC*

22   *Financial Consultant Litigation,* 2009 WL 2137224,*19 (E.D. Pa.) (approving final class action

23   settlement in which all claims were released including those that "could have been asserted"); and

24   *In re Cendant Corp. Litig.,* 264 F.3d 201, 227 (3d. Cir. 2001).  Second, the settlement must neces-

25   sarily limit future actions for injunctive relief, as opposed to individual damage claims, arising out

26   of the same facts.  If not, settlement on a class-wide basis would be illusory as individuals could

27   continue to seek what is effectively class relief against defendants.  Such uncertainty would no

28

1    doubt undermine all class settlements as defendants would have no incentive to negotiate with

2    plaintiffs if such negotiations could not secure an end to litigation.

3    **IV.    THE ATTORNEYS' FEES AND EXPENSES ARE REASONABLE**

4           Although the Parties have agreed on the maximum amount of attorneys' fees and expenses

5    below which defendant will not object, the Court has discretion over the amount to be awarded.

6    *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Under Ninth Circuit precedent where a determi-

7    nation of fees arises out of a settlement agreement, the Court may determine a reasonable fee us-

8    ing a lodestar with a multiplier analysis. *See Wing v. Asarco Inc.*, 114 F.3d 986, 988 (9th Cir.

9    1997).

10          The lodestar figure, or "touchstone," is based on the total number of reasonable attorney

11   hours expended multiplied by a reasonable hourly rate for each attorney involved in the litigation.

12   *Lealao v. Beneficial Ca., Inc.*, 82 Cal.App.4th. 19, 26 (2000); *Friend v. Kolodzieczak*, 72 F.3d

13   1386, 1389 (9th Cir. 1995). Three factors are generally looked at in a lodestar calculation: "(1)

14   counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to

15   compensate for various factors (including unusual skill or experience of counsel, or the *ex ante*

16   risk of nonrecovery in the litigation)." *In re HPL Technologies, Inc. Sec. Litig.*, 366 F.Supp.2d 912,

17   919 (N.D. Cal. 2005). It is proper to calculate attorneys' fees at prevailing rates to compensate for

18   delay in receipt of payment. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002). Fur-

19   ther, the standard lodestar formula is not limited to this initial mathematical calculation and may

20   be enhanced with a multiplier upon consideration of a variety of factors. *Lealao*, 82 Cal.App.4th at

21   41 (quoting *Press v. Lucky Stores, Inc.*, 34 Cal.3d 311, 322 (1983)).

22          **A.     Class Counsel's Base Lodestar is Reasonable and Appropriate**

23          As supported by the attached declarations of Scott A. Kamber and David C. Parisi, Class

24   Counsel's base lodestar is $720,432.98.  (Kamber decl., ¶4, Parisi decl., ¶4.)[4]

25

26

27

28

1    Although several lawyers were involved in the litigation of this matter, each made conscious effort

2    to minimize the duplication of work. (Kamber Decl. ¶6 .) Therefore, Class Counsel's base, or

3    touchstone, lodestar amount is $720,432.98.

4        **B.      Class Counsel's Requested Multiplier Falls Within the Range Typically
                   Approved by This Court and Is Reasonable Given the Facts of the Litigation**

5

6        The parties have agreed that an attorney's fee award not exceeding $1.870 million is ap-

7    propriate here. Class counsel's base lodestar is $720,432.98. Given the hours expended, the con-

8    tingent nature and complexity of the case, the tenor of the litigation, the novel legal issues, the na-

9    ture of the Class claims, and the substantial result achieved on the behalf of the Class, applying a

10   multiplier of 2.5 in order to arrive at the attorneys fees is reasonable and warranted here. This

11   would result in an attorney fee award of $1,800,857.45.

12       "The product of reasonable hours times a reasonable rate does not end the inquiry."

13   *Hensley*, 461 U.S. at 434. Indeed, the initial lodestar figure "may be adjusted upward or downward

14   to account for several factors including the quality of the representation, the benefit obtained for

15   the class, the complexity and novelty of the issues presented, and the risk of nonpayment". *Hanlon

16   v. Chrysler*, 150 F.3d 1011, 1029 (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69 (9th Cir.

17   1975).)

18       The review of the relevant factors below demonstrates that plaintiffs are entitled to the re-

19   quested multiplier. Under Ninth Circuit precedent, the setting of a lodestar rate and enhancement

20   requires the consideration of the factors set forth in *Kerr v. Screen Extras Guild*, 526 F.2d 67, 69.[5]

21   Lodestar fee enhancement for contingent risk accounts for the possibility that the attorney will not

22   _____

23       [5] The *Kerr* factors include: (1) the time and labor required; (2) the novelty and difficulty of the
     issues involved; (3) the skill required to perform the legal services properly; (4) the preclusion of
24   other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time
     limitations imposed by the case; (8) the amount in question and the results obtained; (9) the
25   experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the
     nature and length of the professional relationship with the client; and (12) awards in similar cases.
26   *Kerr*, 526 F.2d at 69-70.  Many of these factors are addressed throughout this brief and "[t]he
     Court need not discuss specifically each factor so long as the record shows that the court
27   considered the factors called in to question by the case at hand.  *Newhouse v. Robert's Ilima
     Tours, Inc.*, 708 F.2d 436, 441 (9th Cir. 1983).

28

1   receive payment if the suit does not succeed, and therefore constitutes earned compensation,

2   which "is intended to approximate market-level compensation for such services, which typically

3   includes a premium for the risk of nonpayment or delay in payment of attorneys' fees." *Ketchum v.*

4   *Moses*, 24 Cal. 4th 1122, 1138 (2001). Indeed, in *Graham v. DaimlerChrysler Corp.*, 34 Cal.4[th]

5   553, 579 & 582 (2004), the Court held that while "the lodestar is the basic fee for comparable le-

6   gal services in the community, it may be adjusted by the court" based on various factors including

7   the novelty and difficulty of the questions involved, the skill displayed in presenting them, the

8   contingent nature of the case, and whether an exceptional effort produced an exceptional result.

9   *See e.g., Serrano v. Priest,* 20 Cal.3d 25, 43 (1977).

10      Lodestar multipliers generally range from 2-4 though even higher multipliers have been

11  awarded. *Wershba v. Apple Computer, Inc*., 91 Cal.App.4th 224, 255 (2001) ("Multipliers can

12  range from 2 to 4 or even higher"); *see also Vizcaino*, 290 F.3d at 1052-54 (listing, *inter alia,* lode-

13  star multipliers in class action throughout the country, finding the average multiplier to be 3.32,

14  and approving a multiplier of 3.65). Indeed, "[m]ultipliers in the 3-4 range are common in lodestar

15  awards for lengthy and complex class action litigation." *Van Vranken v. Atlantic Richfied Co.,* 901

16  F.Supp.294, 297 (N.D. Cal., 1995) (citing *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534,

17  549 (S.D.Fla.1988) ("[t]he range of lodestar multiples in large and complicated class actions runs

18  from a low of 2.26 to a high of 4.5").)

19      Without even considering the expenses Class Counsel incurred prosecuting this matter, ap-

20  plying a multiplier of 2.5 is appropriate. As in many class actions, this case was accepted on a con-

21  tingency fee basis, with a strong chance of non-recovery. Defendants made it clear that they be-

22  lieve that plaintiffs have a remote chance of recovery. Plaintiffs' counsel believes that this is one of

23  the more challenging cases which they have filed. [6] Class counsel's willingness to undertake this

24  litigation was risky, and despite such risk, an exceptional result was achieved for the class. Further,

25

26  _____

27      [6] The requested multiplier of 2.5 falls well below the 4.0 multiplier that this Court has set as a
    reasonable expectation where a plaintiff gives the case a one in four chance of success.  *See In re*
    *Chiron Corp. Sec. Litig.*, 2007 WL 4249902 at *9.

28

1   no other counsel has been willing to represent the class in this matter. (*See* Dkt. No. 87, pp.31-32.)

2   Additionally, defendant has made clear that absent a settlement this matter would have continued

3   to be aggressively defended. Analysis of novel issues, significant investigation, discovery and

4   careful and extended negotiation of the final settlement agreement were required to ensure maxi-

5   mum benefit to class, and that is in fact what the class obtained. Accordingly, Class Counsel's base

6   lodestar of $720,432.98 warrants a multiplier of 2.5, which results in an attorney's fees award of

7   $1,800,857.45..

8         **C.**     **Plaintiffs' Request for Reimbursement of their Extended Costs is Reasonable**

9       Class Counsel have expended in excess of $9,000.00 in reimbursable expenses, such as fil-

10   ing fees, appearance fees, expert consulting charges, travel, copying, and other similar expenses.

11   (Kamber decl., ¶6 and Parisi decl., ¶5.) These are the types of expenses routinely charged to

12   hourly paying clients, were incurred in the conduct of the litigation, and are reasonable. Costs that

13   are of the type typically billed by attorneys to paying clients in the marketplace should be reim-

14   bursed. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the

15   award of attorney's fees those out-of-pocket expenses that "would normally be charged to a fee

16   paying client." (citation omitted); *In re Media Vision Tech. Sec. Litig.,* 913 F.Supp. 1362, 1366

17   (N.D. Cal. 1996); *Bracher v. Bray-Doyle Indep. Sch. Dist. No. 42*, 8 F.3d 722, 725-26 (10th Cir.

18   1993) (expenses recoverable if customary to bill clients for them); ("Attorneys may be compen-

19   sated for reasonable out-of-pocket incurred and customarily charged to their clients, as long as

20   they 'were incidental and necessary to the representation of those clients.") (citation omitted).

21       Nonetheless, the parties also negotiated an agreement with regard to the reimbursement of

22   Class Counsel's expended litigation costs. Accordingly, Class Counsel has limited its fee request

23   to the agreed upon amount of $9,000.00.

24   **V.**    **THE COURT SHOULD APPROVE THE AGREED-UPON INCENTIVE AWARDS**
           **TO THE CLASS REPRESENTATIVES**

25       Under the Settlement Agreement, the Class Representatives, Joel Griffiths, Gadgetwiz, Inc.

26   and Brad Zigler, are to receive an award of $1,000.00, each. "[N]amed plaintiffs, as opposed to

27   designated class members who are not named plaintiffs, are eligible for reasonable incentive

28

1    awards." *Knigh v. Red Door Salons, Inc.t*, No. 08-01520 SC, 2009 WL 248367, at *7 (quoting *Sta-*

2    *ton v. Boeing Co.,* 327 F.3d. 938, 977). The Court has discretion to approve any incentive award

3    and should consider relevant factors, including: (1) the actions the plaintiff has taken to protect the

4    interests of the class; (2) the degree to which the class benefited from those actions; (3) the amount

5    of time and effort the plaintiff expended in pursuing the litigation; and (4) reasonable fears of

6    workplace retaliation. *Staton*, 327 F.3d at 977. California courts have recognized the appropriate-

7    ness of incentive awards in similar actions. *See In Re Mego Fin. Corp. Sec. Litig.*, 213 F. 3d 454,

8    463 (9th Cir. 2000) (approving $5,000 incentive award to two class representatives in a settlement

9    of $1,725,000); see also In re U.S. Bancorp Litig., 291 F. 3d 1035, 1038 (8th Cir. 2002) (approving

10    $2,000 incentive awards to five class representatives in a settlement of $3,000,000 to the class).

11      These awards are reasonable and well within the range of similar awards.[7] The class repre-

12    sentatives were actively involved in the prosecution of this matter, such as by: bringing the alleged

13    violation to the attention of Class Counsel; working with Class Counsel in the investigation of

14    their claims; and participating in the negotiation of the Settlement Agreement. (See declarations of

15    Brad Zigler and Joel Griffiths, Dkt. Nos. 66-4 and 66-6.) But for the class representatives bringing

16    the alleged violations to the attention of Class Counsel and their participation and willingness to

17    undertake the responsibilities and risks attendant with bringing a representative action, the sub-

18    stantial benefit to the class discussed above would not have resulted. The class representatives,

19    therefore, request that this Court approve the agreed-upon incentive award of $1,000.00, each.

20    **VI.   CONCLUSION**

21      For the foregoing reasons, plaintiffs respectfully ask that the Court grant final approval of

22    the proposed settlement agreement, approve the form and manner of notice described above, enter

23    a final approval order, and grant such further relief the Court deems reasonable and just.

24    ————————————————

25      [7] A Federal Judicial Center report looked at incentive awards in four federal districts and found

26    that "median amount of all awards to class representatives" in four federal districts were $7,500, $12,000, $7,500, and $17,000.  (Federal Judicial Center, Empirical Study of Class Actions in Four

27    Federal District Courts: Final Report to the Advisory Committee on Civil Rules by T. Willging, L. Hooper & R. Niemic (1996).)

28

Dated:  August 20, 2009

SCOTT KAMBER
KAMBEREDELSON, LLC

By: _____s/Scott A. Kamber_____
     Attorneys for Plaintiffs
     Brad Zigler and Joel Griffiths